COMMONWEALTH *vs.* AARON KINCAID.

No. 02-P-1714.

Berkshire. February 4, 2004. - August 20, 2004.

Present: ARMSTRONG, C.J., BECK, & CYPHER, JJ.

Further appellate review granted, 442 Mass. 1112 (2004).

*Rape. Joint Enterprise. Jury and Jurors. Evidence,* Joint venturer, Flight.
*Practice, Criminal,* Jury and jurors, Polling of jury, Deliberation of jury.

In a postverdict inquiry of the jurors following their conviction of the
defendant of aggravated rape, the judge erred when he found that the jury
were exposed to extraneous matter, where the record did not support the
judge's ultimate finding that the topic of an alleged joint venturer's flight
had been improperly introduced into the deliberations from a source outside
the jury room; rather, it was equally or more likely that a juror inferred
that the alleged joint venturer had fled and shared that inference with the
other members of the jury [661-665]; moreover, even if the jury were
exposed to an extraneous influence, the Commonwealth met its burden of
proving beyond a reasonable doubt that the information did not prejudice
the defendant [665-666].

INDICTMENTS found and returned in the Superior Court Department on March 25, 1999.

The case was tried before *Thomas J. Curley, Jr.,* J., and motions for a postverdict inquiry and for a new trial were heard by him.

*David F. Capeless,* Assistant District Attorney, for the Commonwealth.

*James L. Sultan (Amy S. Albert* with him) for the defendant.

CYPHER, J. In September, 2001, a Superior Court jury found the defendant, Aaron Kincaid, guilty of four counts of aggravated rape (G. L. c. 265, § 22).[1] The theory of the Commonwealth's case was that the defendant had committed the rape as a joint venturer with Richard Lampron. The theory of

---

[1]The defendant was found not guilty of drugging another with the intent of having unlawful sexual intercourse. G. L. c. 272, § 3.

the defense was consent. At the time of the trial, Richard Lampron was a fugitive from justice. The judge and counsel had taken care to prevent this fact from coming to the jury's attention.

In May, 2002, the defendant filed a motion for a new trial, specifically for postverdict inquiry of the jurors. The defendant alleged that the jurors had learned that Lampron had fled and that this information constituted an extraneous influence on the jury. The trial judge conducted an evidentiary hearing and inquired of all of the deliberating jurors. The judge ordered a new trial after concluding that the jury had been exposed to extraneous matter (Lampron's flight) and that the Commonwealth had not proved beyond a reasonable doubt that the defendant was not prejudiced by the introduction of the extraneous matter. *Commonwealth* v. *Fidler*, 377 Mass. 192, 201 (1979). The Commonwealth appeals, claiming that (1) the judge erred in finding that the jury had been exposed to extraneous matter and (2) even if the jury had been so exposed, the Commonwealth had proved beyond a reasonable doubt that the defendant was not prejudiced.[2]

1. *Background.* We briefly summarize the relevant evidence against the defendant and the relevant procedural history.

a. *The Commonwealth's case.* The victim, Gail,[3] testified that the defendant and Lampron engaged in sexual acts with her against her will, on September 23, 1998, while she was stupefied. Two friends of the defendant testified that they had seen a videotape of the defendant and Lampron engaged in sexual acts with the victim while she appeared to be unconscious. Three other friends of the defendant described what the defendant had told them regarding "what we did to [Gail] last night," including sticking a "barrette" inside her and not being able to get it out; these friends also testified that the defendant had told them that drugs were stolen from Gail's purse and that she was "unconscious," and that Lampron had cautioned the defendant, "That's enough; don't say any more."

The defendant did not admit that he had engaged in any

---

[2]The defendant filed a notice of appeal from his convictions. There has been no activity on the direct appeal.

[3]A pseudonym. Gail was Lampron's former girlfriend.

sexual activity until he was faced with deoxyribonucleic acid (DNA) testing results that showed that he and another man had engaged in sexual intercourse with Gail, contrary to the detailed written description he had previously provided the police regarding the night in question. In addition, Gail testified that an elastic and plastic hair band had been inserted into her vagina. One of the defendant's friends testified that the videotape depicted Lampron inserting a "barrette" into her vagina. Scientific testing of the object established that it contained DNA consistent with having come from the defendant, Gail, and a second male.

b. *The defendant's testimony.* We include relevant portions of the defendant's testimony. The defendant testified that the videotape was taken from the trunk of his car by Lampron between February 4 and February 8, 1999. The defendant also testified that on February 4, he had discussed with Lampron the fact that he was being investigated and that he was on his way to the district attorney's office.

c. *The postverdict inquiry.* The defendant moved for a postverdict inquiry on May 21, 2002. The defendant's attorney alleged, by way of affidavit, that it had come to his attention that a deliberating juror, juror A,[4] had claimed that the jurors might have had some information about Lampron that was not learned in the courtroom.[5] The judge, in consultation with both parties, inquired of all of the jurors, beginning with juror A, to determine whether they had learned anything of Lampron's absence.[6]

Juror A reported that she was concerned that other jurors "knew the whereabouts or they knew the situation regarding the person who was named as a coventurer in the indictments." She explained that one juror, in the process of discussing why he

---

[4]To protect the identity of the deliberating jurors, we refer to them by letters.

[5]The motion was precipitated by comments from one of the jurors, juror A, to an attorney acquaintance to the effect that the jury had possessed information about Lampron's flight that it should not have had and that the information had influenced juror A's decision. The attorney shared this information with defense counsel, and the motion was filed.

[6]Lampron has been found and is pursuing his defense. See *Commonwealth v. Lampron*, 441 Mass. 265 (2004).

thought the defendant was guilty, had "alluded to the fact that the other person named had taken off." She reported that she said that she did not know that and another juror said "we're not supposed to know that." Juror A identified the juror who alluded to Lampron's flight as an individual with a distinctive accent.

Juror B, the juror with the distinctive accent, testified that there was some "mention" of Lampron's absence from the trial. He denied that he had raised the subject of Lampron's absence. He told the judge that he believed that Lampron's flight had been mentioned during the evidence.

Of the other ten jurors, five did not recall any mention, during deliberations, of Lampron's absence and five jurors recalled some mention of Lampron's absence during deliberations. Two of the jurors, juror C and juror D, testified that they thought that they had made the assumption of Lampron's flight based on information learned from the evidence presented at trial. Juror D testified that the information regarding Lampron's flight may have been inferred from the testimony regarding a missing videotape.[7]

One of the five, juror E, testified that there "was one person who mentioned that he thought that [Lampron] had taken off." The judge probed juror E further for the juror's precise words and juror E explained, "I think he said, I think I've heard that he's no longer around here, he took off; something to that effect." Juror E also said that she did not remember who specifically responded, but that the jurors agreed that it was not information that had been introduced to them and therefore they should not take it into consideration.[8]

The judge found that "at one point a juror raised the issue of Lampron's absence; it may have been by a comment or a question." The judge also found that, after Lampron's name came up, another juror said, "in substance, that Lampron was on the run, that is, that he had fled. . . . And one of the jurors

---

[7]The disappearance of the videotape and whether it depicted consensual sexual intercourse or rape was a focal point of the evidence.

[8]Juror E described the juror who referred to Lampron's absence as the man with the distinctive accent.

in explaining his thinking alluded to the fact that the other person (i.e., Lampron) had taken off."

The judge found that juror B's testimony that he had not introduced the subject of Lampron's absence was not credible. The judge found that it was probable that juror B had made the statement that Lampron was "on the run." The judge based this finding on testimony from two other jurors that they had heard the comment from juror B and on juror B's reaction to the question.[9]

The judge concluded that "it is more probable that there had been an explicit, fact-like reference to Lampron's flight rather than the jury having reasoned, opined, or assumed its way to that conclusion." The judge ruled that the defendant "has carried his burden of proof, and that he has shown, by a preponderance of the evidence, that the jury [were] exposed to extraneous matter during [their] deliberations."

2. *Discussion.* The Commonwealth argues that the trial judge's ultimate finding that the deliberating jury were exposed to extraneous matter was clearly erroneous. According to the Commonwealth, a more accurate finding is that the jurors inferred that Lampron had fled based on record evidence. We agree.

A trial judge has considerable discretion in ruling on a motion for a new trial. See, e.g., *Commonwealth* v. *Markham*, 10 Mass. App. Ct. 651 (1980); *Commonwealth* v. *Gordon*, 13 Mass. App. Ct. 1085 (1982). Where, as here, the motion judge was also the trial judge, his rulings are "afforded special deference." *Commonwealth* v. *Hung Tan Vo*, 427 Mass. 464, 467 (1998). *Commonwealth* v. *Gaudette*, 56 Mass. App. Ct. 494, 503 (2002). We accord the trial judge's findings the same deference in a postverdict context as we do in any other: that is, we defer to them unless they are clearly erroneous. *Commonwealth* v. *Ciminera*, 11 Mass. App. Ct. 101, 109, *S.C.*, 384 Mass. 807 (1981). However, we are also mindful that trial judges should make every effort to avoid interjecting themselves into the jury's deliberative process. See, e.g., *Commonwealth* v. *Scanlan*, 9

---

[9]The judge concluded that juror B's hesitation in answering the question stemmed from his recognition that he had said something during deliberations that he should not have said.

Mass. App. Ct. 173, 183-184 (1980) ("we would embark on a slippery slope indeed if we began to monitor and evaluate the internal procedures of the jury"); *Commonwealth* v. *Royster*, 15 Mass. App. Ct. 970, 970 (1983). The instant case presents the unusual circumstance where we determine that the judge's ultimate finding, although carefully considered and deliberate, is clearly erroneous and that the judge either did cross, or came perilously close to crossing, the line of impermissibly evaluating the jury's deliberations. Consequently, we reverse his order allowing the motion for a new trial.

The judge determined that the defendant was required to prove an extraneous influence by a preponderance of the evidence and, if that burden was met, the Commonwealth would then be required to prove beyond a reasonable doubt that the extraneous influence did not prejudice the defendant. The judge applied the correct test, *Commonwealth* v. *Fidler*, 377 Mass. at 201, and imposed the appropriate initial burden of proof by a preponderance of the evidence on the defendant. *Commonwealth* v. *Amirault*, 399 Mass. 617, 626 (1987). We conclude, however, that the quantum of proof, that is, by a preponderance of the evidence, was not shown.

The burden of proving a fact "by a preponderance of the evidence" means, in this instance, that the fact finder had to find that it was more probable than not, see *Goffredo* v. *Mercedes-Benz Truck Co.*, 402 Mass. 97, 102-103 (1988), that the jury learned of Lampron's flight from a source outside of the trial. If the probability that the proposition is false is equal to the probability that it is true, then the burden has not been met. *Corsetti* v. *Stone Co.* 396 Mass. 1, 24 (1985). See *Sargent* v. *Massachusetts Acc. Co.*, 307 Mass. 246, 251 (1940) (where evidence tends to equally support two inconsistent propositions, neither can be found to be true); *Continental Assur. Co.* v. *Diorio-Volungis*, 51 Mass. App. Ct. 403, 409 n.9 (2001).

We, of course, accept the judge's credibility determinations and, necessarily, the subsidiary findings which flow from those determinations. Nevertheless, the record does not support the judge's ultimate finding that the topic of Lampron's flight was improperly introduced into the deliberations from a source outside of the jury room. On the record before us, it is at least

equally likely, if not more likely, that a juror inferred that Lampron had fled and shared that inference with the other members of the jury.

The judge based his ultimate finding on the testimony of four of the jurors, to the effect that a juror had said that Lampron was "on the run" or "had fled" and that such language "strongly suggests a statement of fact, and the introduction of such a fact would be an extraneous influence." The judge found that of the seven jurors who recalled any reference to Lampron's absence, five testified that Lampron was "on the run" or "had fled" or "[thought that he'd] heard that [Lampron's] no longer around here, he took off; something to that effect"; while two jurors testified that they only "assumed" that Lampron had fled. It was clear error to find that "express reference to Lampron's flight" indicated that the jury had been exposed to extraneous matter.

First, there is nothing in the record to indicate that the source of juror B's information was extraneous. That juror B denied introducing the subject and that the judge did not believe him does not prove that juror B's observation came from a source outside the jury room. Compare *Commonwealth* v. *Fidler*, 377 Mass. at 198 (proper for judge to refuse to consider portions of affidavit concerning juror discussion of matters that they were instructed to disregard as such matters were "part of the internal decision making process of jury deliberations").

The defendant urges us to consider the nature of the information rather than the source of the information in assessing whether the jury were exposed to an extraneous influence. According to the defendant, the fact that a juror commented about a matter the jury were instructed to disregard is evidence of an extraneous influence on the jury. "An extraneous matter is one that involves information not part of the evidence at trial 'and raises a serious question of possible prejudice.' " *Commonwealth* v. *Guisti*, 434 Mass. 245, 251 (2001), quoting from *Commonwealth* v. *Kater*, 432 Mass. 404, 414 (2000). The proscription against jury exposure to extraneous matter does not encompass the subjective opinions of jurors, their attitudes, or their speculation about the facts of the case. *Commonwealth* v. *Fidler*, 377 Mass. at 199. We conclude that the jury's brief

speculation about Lampron's absence constituted juror inference from the evidence presented and that the defendant did not prove by a preponderance of the evidence that it flowed from an extraneous source. See *Commonwealth* v. *Scanlan*, 9 Mass App. Ct. at 183 (expressions of opinion by jurors about defendant's guilt during trial in violation of judge's instruction did not constitute extraneous influence); *Commonwealth* v. *Mc-Quade*, 46 Mass. App. Ct. 827, 833-835 (1999).

Second, there was sufficient information from the evidence presented at the trial itself for a juror to conclude that Lampron had fled. There is no doubt that the jury were aware that Lampron was absent as the judge had instructed them not to speculate about his absence.[10] Additionally, the jury could have inferred from the defendant's testimony about the videotape that Lampron had fled. We may presume that the juror's followed the instructions. *Commonwealth* v. *Fidler*, 377 Mass. at 198-199.

Third, as the judge observed in his findings, throughout the trial the jurors affirmed to the judge that they had not been exposed to extraneous matter. The judge had questioned the venire before impanelment to make certain that no one in the jury pool had outside information about the case. The judge also questioned the jurors every day regarding whether any juror had heard, read, or seen anything about the case outside the courtroom. The jurors always responded in the negative.

Finally, that the jury were curious about the coventurer is not surprising. The fact that the coventurer might have fled did not require a leap in logic or an overly fertile imagination. That this subject could have emerged in the deliberations is also not surprising and does not require a remedy. *Commonwealth* v. *Schoen*, 24 Mass. App. Ct. 731, 734 (1987). "In the interior

---

[10]The judge instructed the jury: "Now you also heard evidence in this case of statements allegedly made by Richard Lampron. At some point in this case you will need to decide whether Mr. Lampron — or, that the Commonwealth has proven that Mr. Lampron and the defendant Mr. Kincaid engaged in a joint venture, and I'm going to define joint venture for you at the end of the instructions, but I instruct you now that for various legal reasons it is not uncommon that persons charged as coventurers are tried separately, and you are not to speculate as to why that is the case here. It is irrelevant to your proper deliberations."

workings of a jury there is room for impropriety that is short of unlawfulness." *Commonwealth* v. *Scanlan,* 9 Mass. App. Ct. at 184. Furthermore, we may presume that the jurors followed the judge's instructions to decide the case on the evidence before them. *Commonwealth* v. *Fidler,* 377 Mass. at 198-199 (even if juror comments on evidence struck by judge it must be presumed that in reaching verdict jurors heeded judge's instructions).

Even if the jury were exposed to an extraneous influence, the Commonwealth met its burden of proving beyond a reasonable doubt that the information did not prejudice the defendant. When an extraneous influence has been introduced to a jury, a judge "may consider such matters as (1) the fact that the improper remark prompted an immediate reprimand from another juror . . . (2) whether there was overwhelming evidence of guilt . . . ; and (3) whether the extraneous matter produced such a high probability of prejudice that error must be inferred." *Commonwealth* v. *Fidler,* 377 Mass. at 201 n.8.

The judge concluded, and we agree, that the Commonwealth satisfied the first two factors identified in *Commonwealth* v. *Fidler, supra.* A juror promptly responded to the introduction of the topic of Lampron's flight with the admonition that the jurors were not supposed to consider Lampron's whereabouts. There was also overwhelming evidence of guilt, including the testimony from two witnesses about having viewed a videotape of the defendant having sexual intercourse with Gail when she appeared to be unconscious.

The judge then focused "on the probable effect of the extraneous facts on a hypothetical average jury,"[11] *Commonwealth* v. *Guisti,* 434 Mass. at 253, quoting from *Commonwealth* v. *Fidler,* 377 Mass. at 201, to determine whether the Commonwealth met its burden of proving beyond a reasonable doubt that the extraneous information did not prejudice the defendant. The judge reasoned that the fact of Lampron's flight corroborated

---

[11]The judge specifically did not credit juror A's testimony that during deliberations she said that Lampron's flight affected her view of the case. He also rejected the defendant's argument that, on the basis of *Commonwealth* v. *Cuffie,* 414 Mass. 632, 638 (1993), an analysis other than of the impact on the hypothetical average jury should be employed.

the Commonwealth's testimony that the missing videotape was inculpatory and enhanced the credibility of the Commonwealth's witnesses regarding the videotape while detracting from the defense evidence on that critical point. In making this assessment, however, the judge neglected to balance the information of Lampron's flight against the overwhelming evidence of guilt. Although the trial judge felt constrained to grant the motion because of the extraneous influence that he found, he also commented that "the evidence more than amply supported the verdicts." When the information is viewed in context with all of the evidence, we conclude that the Commonwealth has shown beyond a reasonable doubt that the defendant was not prejudiced by the discussion of Lampron's flight. *Ibid.*

4. *Conclusion.* We comment on the questions the judge posed to the jurors. The judge asked the jurors whether the subject of Lampron's absence had been discussed during deliberations. If a juror responded affirmatively, the judge probed the juror further to determine how the subject happened to come up, who had raised it, and what the source of the information had been. In this way, the judge came perilously close to intruding on the deliberative process. A proper procedure would have been to ask each juror whether he or she had been subjected to an extraneous influence, i.e., whether the juror had learned of anything about the case from outside the courtroom during the trial and, specifically, whether the juror had learned anything about Lampron's absence from outside of the courtroom. "Once the existence of extraneous influences upon the jury was eliminated, speculation about what the jurors thought and why was improper." *Commonwealth* v. *Schoen*, 24 Mass. App. Ct. at 734. See *Commonwealth* v. *Coles*, 44 Mass. App. Ct. 463, 466 n.2, 467 n.3 (1998).

*Order allowing motion for new
trial reversed.*