Commonwealth *vs.* Raul Cabral.

No. 06-P-987.

Bristol. March 6, 2007. - May 16, 2007.

Present: Cohen, Mills, & Katzmann, JJ.

*Rape. Deoxyribonucleic Acid. Search and Seizure,* Expectation of privacy.
*Practice, Criminal,* Argument by prosecutor.

A Superior Court judge properly denied a motion to suppress the results of a
court-ordered test for deoxyribonucleic acid from the saliva of the defendant,
where the defendant had no expectation of privacy in his spittle, which he
left on a public sidewalk after expectorating there. [71-75]

At the trial of rape charges, there was no error in the prosecutor's closing
argument, which used the description "overwhelming" in reference to the
evidence, especially when taken in the context of the entire closing argu-
ment, as well as the trial judge's instructions, and while the prosecutor's
isolated interjections in the argument of her own assessment of the
defendant's guilt were better left unsaid, they were not error. [75-76]

Indictments found and returned in the Superior Court Depart-
ment on October 17, 2003.

A pretrial motion to suppress evidence was heard by *Robert
J. Kane*, J., and the cases were tried before *Frank M. Gaziano*,
J.

*Dana Alan Curhan* for the defendant.

*William R. Connolly*, Assistant District Attorney, for the
Commonwealth.

Katzmann, J. Raul Cabral, suspected by a family of raping
their mentally challenged daughter, expectorated on a public
sidewalk. A private investigator, on sick leave from the New
Bedford police department (department) — who had been hired
by the family to surveil the suspect covertly and to attempt to
obtain deoxyribonucleic acid (DNA) evidence — retrieved the
saliva and sent it for DNA testing. Ultimately, the results provided
the basis for a court-ordered DNA test, which implicated the

defendant (who had been unaware that the observant investigator had been on the case and was surveilling him).

After a jury trial in Superior Court, the defendant was convicted of two counts of rape in violation of G. L. c. 265, § 22(*b*). He raises two claims on appeal: that the motion judge erred in failing to suppress the results of the court-ordered DNA test; and that he is entitled to a new trial because the prosecutor's closing argument contained expressions of personal opinion on the weight of the evidence. We conclude that under the circumstances, the expectorating defendant had no reasonable expectation of privacy in his spittle, or in the DNA evidence derived therefrom. Moreover, his contentions concerning the prosecutor's closing argument are not persuasive. We affirm.

*Background.* In ruling on the motion to suppress, the motion judge made the following findings. The victim is a mentally challenged individual who lives with her parents in New Bedford. At the time of the motion hearing, she had two daughters, ages eleven and two years old. After discovering the second pregnancy, the victim's family attempted to determine the father.[1] When a doctor informed the family that the onset of the pregnancy was in October, 2001, the family began to suspect that the defendant was the father. The family suspected the defendant because he was working at their residence during October, 2001, and had access to the victim. This suspicion was confirmed somewhat when, after confrontation, the victim informed her sister that the defendant had impregnated her[2] and that other individuals had touched her inappropriately.[3] The victim's family conveyed this information to the department. On the basis of this information, Detective Pamela Alves sought

---

[1]After the first pregnancy, the victim's family attempted unsuccessfully to discover the identity of the father. According to the victim's sister, the family believed that the victim was impregnated at her high school. A private detective's investigation did not reveal any pertinent information.

[2]It is unclear from the motion judge's findings and the record whether the defendant actually was named or just was identified sufficiently to enable the victim's sister to form an opinion.

[3]The victim's sister also testified that the defendant had been working at the family residence during the time the victim became pregnant with her first child and that he had access to the victim during both periods.

DNA samples[4] from multiple individuals, including the defendant. Other than the defendant, all those requested to provide DNA samples complied. The samples did not yield a "match."

In light of the defendant's refusal to provide a sample and Alves's inability to obtain a court order requiring one, the victim's family hired a private investigator, one Albino Faria,[5] to secure DNA evidence from the defendant. Working independently of the department, Faria surveilled the defendant for a "number of months," but was unable to obtain a sample.[6] Faria therefore devised a plan wherein his assistant, one Carlos Lourenco,[7] would contact the defendant to arrange for plumbing work at Lourenco's house. The defendant performed the requested plumbing work, during which time he spat on the sidewalk outside of Lourenco's residence. Lourenco collected the spittle[8] and presented it to Faria, who sent it to a laboratory for genetic testing.

The results implicated the defendant.[9] Faria provided a copy of the results to Detective Alves, accompanied by a report of his investigation.[10] With this information in hand, Detective Alves sought an order from the District Court requiring the defendant to submit a DNA sample. A District Court judge issued the order[11] without an explanatory opinion. Eventual test-

[4]"DNA sample" commonly is used as a shorthand term for the saliva or other bodily matter from which DNA evidence may be obtained after testing. See generally Giannelli and Imwinkelried, Scientific Evidence c. 18 (3d ed. 1999 & Supp. 2005).

[5]Faria is a police officer employed by the department. At the time he was hired by the victim's family, he was on sick leave due to a surgery. There was evidence at the suppression hearing that Faria was paid his salary throughout the relevant period.

[6]Detective Alves testified that she had not recommended the family retain a private investigator and had no knowledge of the private investigation until February, 2003.

[7]Faria testified that Lourenco was a part-time employee at Faria's detective agency. Lourenco was not an employee of the department.

[8]Faria testified that Lourenco used a napkin to pick up the spittle.

[9]The results documentation included a stipulation that due to the collection technique the results were not admissible in a court of law.

[10]During the course of his investigation, Faria was not in contact with members of the department in relation to this matter.

[11]See generally *Commonwealth* v. *Maxwell*, 441 Mass. 773, 778-779 (2004);

ing identified the defendant as the father of both of the victim's children.

*Discussion.* 1. *DNA sample.* The motion judge denied the defendant's motion to suppress, ruling that he had no expectation of privacy in his saliva when he abandoned it on a public sidewalk. On appeal, the defendant essentially argues that the motion judge erred because the DNA sample was obtained in a ruse devised by a State actor, and that his State and Federal constitutional rights were violated.

The decision in *Commonwealth* v. *Bly,* 448 Mass. 473, 489-491 (2007), is instructive. There, in affirming the denial of a motion to suppress DNA evidence, the Supreme Judicial Court determined that the defendant lacked an expectation of privacy in the cigarette butts and a water bottle that he had abandoned, and that the police did not act improperly in collecting DNA evidence from those items after questioning the defendant on unrelated offenses.[12] The items had been collected by the police pursuant to a ruse where the police had placed cigarettes and the water bottle in the interview room, in the hope, unbeknownst to the defendant (who had declined to provide a blood sample), of collecting DNA evidence. In response to the defendant's argument "that the method used by the Commonwealth in obtaining his known DNA sample constituted a nonconsensual seizure," the Supreme Judicial Court presented the analytical framework that guides us here:

"[The defendant] must bear the threshold burden of show-

*Jansen, petitioner,* 444 Mass. 112, 120-121 (2005).

[12]As described in *Commonwealth* v. *Bly, supra* at 479 n.3,

> "[The] police went to the Massachusetts Correctional Institution . . . where Bly was incarcerated, and he spoke with them voluntarily. During the course of the meeting, which was ostensibly held to ask Bly to provide a blood sample to the police, he smoked three cigarettes from a pack that the detectives had placed on a table in front of him and drank from a water bottle also placed on the table. Bly extinguished these cigarettes in an ashtray that had been cleaned by the detectives prior to the meeting. Bly declined to provide the detectives with a blood sample after speaking with his mother by telephone and deciding to consult an attorney. When the meeting was over, the detectives waited approximately one-half hour to allow Bly an opportunity to return and claim the cigarette butts and water bottle before collecting them for DNA testing purposes."

ing that a warrantless search or seizure occurred. *Commonwealth* v. *D'Onofrio*, 396 Mass. 711, 714-715 (1986). This question is analyzed under the familiar two-part query whether [the defendant] had a subjective expectation of privacy in the items seized, and if so, whether that expectation was reasonable objectively. See *Commonwealth* v. *Montanez*, 410 Mass. 290, 301 (1991), citing *California* v. *Ciraolo*, 476 U.S. 207, 211 (1986)."

*Commonwealth* v. *Bly, supra* at 490. Put another way, "The Fourth Amendment and art. 14 protect from unreasonable search and seizure those areas in which individuals have a subjective expectation of privacy that is objectively 'reasonable,' 'justified,' or 'legitimate.' " *Commonwealth* v. *Krisco Corp.*, 421 Mass. 37, 41 (1995), citing *California* v. *Greenwood*, 486 U.S. 35, 39 (1988). Thus, in analyzing a search by a State actor, we look to whether the defendant had a subjective expectation of privacy in the place searched or the item seized, and whether as an objective matter society would recognize that expectation as reasonable. *Krisco Corp., supra* at 41-42, citing *California* v. *Greenwood, supra.* See generally *Commonwealth* v. *Feyenord*, 62 Mass. App. Ct. 200, 206-207 (2004), *S.C.*, 445 Mass. 72 (2005), cert. denied, 546 U.S. 1187 (2006); Smith, Criminal Practice and Procedure § 158 (2d ed. 1983 & Supp. 2006); Grasso & McEvoy, Suppression Matters Under Massachusetts Law § 3-5 (2006).

In the present case, although the defendant had a reasonable expectation of privacy in his saliva (and other bodily fluids), see *Matter of Lavigne*, 418 Mass. 831, 835-836 (1994); *Jansen, petitioner*, 444 Mass. 112, 120-121 (2005), when he expectorated on to a public street and did not retrieve the fluid, he voluntarily abandoned that protection; he assumed the risk of the public witnessing his action and thereafter taking possession of his bodily fluids. See *Commonwealth* v. *Ewing*, 67 Mass. App. Ct. 531, 540 (no expectation of privacy in cigarette butts abandoned as trash in interview room), *S.C.*, 449 Mass. 1035 (2006). See also *Commonwealth* v. *Pratt*, 407 Mass. 647, 660-661 (1990) (observations and inspections occurring after items deposited in public places generally fail to intrude upon reasonable expectation of privacy); *Commonwealth* v. *Nutile*, 31 Mass.

App. Ct. 614, 619 (1991) (no reasonable expectation of privacy in drugs voluntarily thrown from vehicle); *Commonwealth* v. *Wedderburn*, 36 Mass. App. Ct. 558, 564 (1994) (no reasonable expectation of privacy in drugs dropped on ground during police surveillance).

Here, the motion judge found that the location where the defendant spat was a public street, a place freely accessible to others. See *Krisco Corp.*, 421 Mass. at 42-44. See also *Commonwealth* v. *Pratt, supra* (no reasonable expectation of privacy in trash left on curb); *Commonwealth* v. *Bloom*, 18 Mass. App. Ct. 951, 952 (1984) (defendant had no reasonable expectation of privacy in open area of public restroom). Moreover, there is no indication that the defendant took affirmative action to recover the saliva once it had left his mouth. In *Bly, supra* at 490-491, the defendant did not attempt to retrieve the cigarette butts when leaving the interview room, nor did he request to go back and collect them. The court held that Bly's "wholesale failure to manifest any expectation of privacy in the items whatsoever" compelled the "conclusion that [he] had no subjective expectation of privacy." Id. at 491. See *Ewing, supra* (defendant made no attempt to take cigarette butts when leaving interview room). Contrast *Krisco Corp., supra* at 45 (discussing affirmative steps taken by defendant to protect dumpster from public access). Thus, where the defendant here voluntarily abandoned his saliva onto a public street, the investigator (whether deemed to be functioning in a private capacity or as a State actor) did not infringe on any reasonable expectation of privacy when he recovered the spittle from the street.[13]

The defendant contends that *Bly* stands for the proposition that DNA evidence that is retrieved as the culmination of a ruse can be admissible only if the police had legitimate grounds to

---

[13]Given our conclusion that, in any event, the defendant's privacy interests were not infringed, we need not determine whether the investigator — who also happened to be a police officer on extended sick leave — was acting in a private capacity, or whether he was in fact a State actor or an agent of the State whose actions implicated constitutional protections. *Jansen, petitioner*, 444 Mass. at 119, quoting from *District Attorney for the Plymouth Dist.* v. *Coffey*, 386 Mass. 218, 221 (1982) ("The Fourth Amendment and art. 14 apply 'to searches and seizures conducted by or at the direction of the State' ").

question the defendant, albeit for unrelated offenses.[14] He argues that such circumstances did not occur here, where he was unaware of any actual or surrogate law enforcement presence. This argument is not persuasive. As a factual matter, there was no meaningful connection between the ruse, which led the defendant to the plumbing job, and the collection of the saliva sample. That the defendant spat onto a public street is unrelated to that ruse, except in the most tenuous way — he would not have been on that particular public street but for the plumbing job. See *Commonwealth* v. *Berry*, 420 Mass. 95, 104 (1995) ("If a person surrenders an item voluntarily, 'a "search" or "seizure" within the purview of the Fourth Amendment . . . is not involved.' *Commonwealth* v. *Aguiar*, 370 Mass. 490, 496 [1976], citing *Coolidge* v. *New Hampshire*, 443 U.S. 443, 484-490 [1971]").

In any event, the defendant's argument misapprehends *Bly*. The focus of *Bly* is whether a defendant, by his own actions, manifested a subjective expectation of privacy in the material that yielded the DNA evidence. A factor in that determination is whether a defendant's actions were prompted or coerced by another party. They were not in *Bly*, and they were not here. Plainly, neither the investigator nor anyone else prompted or coerced the defendant to spit on the sidewalk. See *Ewing*, *supra* (no evidence of coercion). Contrast *Commonwealth* v. *Ramos*, 430 Mass. 545, 550 (2000) (defendant's action nonconsensual).

The defendant further counters that the *Bly* case is distinguishable because there, although the police suspected that Bly might refuse to provide a DNA sample, he had not yet refused. The defendant argues that here, by contrast, he had refused, through counsel, to give a DNA sample, such that the ruse effectively yielded the DNA evidence in which he had manifested a privacy interest by refusing voluntarily to provide. This argument is not meritorious. For one thing, the defendant in *Bly* had declined to give a blood sample, a fact that did not thereafter preclude the extraction of DNA evidence from the abandoned cigarette butts.

---

[14]The defendant submitted a letter pursuant to Mass.R.A.P. 16(l), as amended, 386 Mass. 1247 (1982), as *Bly* was released after the oral argument of this case.

For another thing, while at one point the defendant here may have shown a subjective expectation of privacy in his DNA, when he later spat onto the public street and did not attempt to retrieve his saliva, he no longer manifested such a subjective expectation. In any event, as has been noted, given the public nature of the defendant's action, as an objective matter, society would not recognize that expectation as reasonable. In sum, under the circumstances, the defendant did not have a reasonable expectation of privacy in his spittle, or in the DNA evidence derived therefrom.

2. *Closing argument.* In her closing argument, the prosecutor made several comments regarding the strength of the evidence.[15] The defendant asserts that the argument was in error because the prosecutor represented to the jury that, in her personal opinion, the evidence was "overwhelming" and the elements of the charges were proven by the evidence. As the defendant did not object to the argument, we review to determine whether the argument, if error, created a risk of a substantial miscarriage of justice. *Commonwealth* v. *Alphas*, 430 Mass. 8, 13-14 (1999).

A prosecutor may argue the strength of the evidence. *Commonwealth* v. *Santiago*, 425 Mass. 491, 498 (1997), citing *Commonwealth* v. *Shea*, 401 Mass. 731, 738-739 (1988) ("Generally, there is no error in a prosecutor's describing the evidence presented as 'overwhelming' . . ."). Assessing the case's strength for the jury is a "permissible part of marshaling the evidence and arguing forcefully for a conviction." *Santiago, supra.* Here, the prosecutor's comment that the evidence was "overwhelming" was tethered to a recitation of that evidence, permissibly describing the substantial evidence presented by the Commonwealth on the victim's ability to consent to sexual intercourse and the evidence relating to the defendant's intercourse with the victim.

---

[15]Specifically, the prosecutor made the following statements:

"The Commonwealth has proven to you . . . beyond a reasonable doubt that this defendant, Raul Cabral, had sexual intercourse with [the victim]. . . .

"I think the evidence is overwhelming in this case that [the victim] is incapable of giving meaningful consent to sexual intercourse. . . .

"I think the evidence in this case is overwhelming. There's overwhelming evidence, there's scientific evidence, and there's other evidence that supports that, the fact that this defendant clearly had an opportunity to be alone with her."

The prosecutor's use of the description "overwhelming" in two separate instances therefore was not error. See *Commonwealth* v. *Shea, supra* at 738-739. This is especially so when taken in the context of the entire closing argument, *Commonwealth* v. *Lamrini,* 392 Mass. 427, 432 (1984); *Commonwealth* v. *Rodriguez,* 437 Mass. 554, 565 (2002); *Commonwealth* v. *Coren,* 437 Mass. 723, 730-731 (2002), as well as the trial judge's instructions, noted *infra,* that the closing arguments were not evidence and the jury were the sole arbitrators of the facts.

The prosecutor's isolated interjections of her own personal assessment of the defendant's guilt warrant a more cautious examination. See *Santiago, supra.* We conclude that, while the comments were better left unsaid, they were not error. See *Commonwealth* v. *Mitchell,* 428 Mass. 852, 857 (1999). Her interjections do not imply that she (the prosecutor) had knowledge of the evidence not presented to the jury upon which the jury should premise its decision, *ibid.* ("[prosecutor's] use of the phrases 'I think' and 'I suggest' to preface some remarks did not, viewed in their proper context, imply that the prosecutor had personal knowledge or was stating a personal belief"); do not critically misstate the evidence, see *Coren, supra* at 730-732; do not improperly appeal to the jury's sympathies, *Commonwealth* v. *Dumais,* 60 Mass. App. Ct. 70, 74 (2003); and do not instruct the jury as to how it should find, see *Santiago, supra.*

Moreover, the jury repeatedly was reminded that arguments by the attorneys did not constitute evidence. Of particular note is the instruction after the closing arguments, in which the trial judge stated, "The lawyers are entitled to argue the evidence in this case and the reasonable inferences that you can draw from the evidence. As I told you, their arguments are not a substitute for the evidence." These instructions placed the closing arguments in the proper perspective. See *Commonwealth* v. *Clark,* 432 Mass. 1, 10 (2000) (jury presumed to follow judge's instructions); *Commonwealth* v. *Correia,* 65 Mass. App. Ct. 27, 36-37 (2005) (judge's instructions capable of curing error).

*Judgments affirmed.*